# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:24-cv-

MARTHA SWAIN, individually,
SUE SWAIN, individually, and SUE SWAIN
and MARTHA SWAIN, next friends of O.A.
and K.K., minor children,

Plaintiffs,

v.

ROUTT COUNTY DEPARTMENT
OF HUMAN SERVICES,
KRISTIN HINTZ, in her individual capacity,
CAMILLA HAIGHT, in her individual capacity,
PAUNITA MUSET, in her individual capacity,
SGT. GREG GRIFFIN, in his individual capacity,
and STEAMBOAT SPRINGS POLICE
DEPARTMENT,

Defendants.

_____

## CIVIL COMPLAINT AND JURY DEMAND
_____

Plaintiffs Martha Swain, Sue Swain, and Sue Swain and Martha Swain, next friends of

O.A. and K.K., minor children ("Plaintiffs"), by and through undersigned counsel, CONDUIT

LAW, LLC, hereby submit the following Civil Complaint and Jury Demand and assert as

follows:

### PRELIMINARY STATEMENT

1.       On December 24, 2023, when the Swain family should have been celebrating

Christmas Eve—a cherished tradition in their home—Martha Swain and Sue Swain were instead

wrongfully arrested, thrown into jail, and cruelly torn from the two young children in their lives, O.A. and K.K.

2. After enduring a year's long campaign of harassment by Defendants that culminated in an Order Adopting Allocation of Parental Responsibilities and Closing Case ("APR"), Martha, O.A. and K.K.'s mother, along with Sue, the children's grandmother, decided to leave their longtime home in Steamboat Springs, Colorado for a new life in Washington State, where they had several familial connections.

3. Martha and Sue had also planned their relocation to escape unrelenting harassment and violent attacks from O.A.'s biological father, B.A. The harassment reached a head when B.A. broke into the Swain family home in the weeks leading up to the Swains' decision to leave for Washington.

4. But Defendants had other plans for the Swain family. In the absence of any basis for jurisdiction over the Swains and while undertaking warrantless surveillance of their whereabouts, Defendants took the extraordinary step of tracking the Swains' movement across state lines, contacting multiple police departments in Washington State, and arranging for the Swains' eventual wrongful arrest on Christmas Eve in Kitsap County, Washington.

5. What should have been a happy Christmas holiday for O.A and K.K. turned into a living nightmare for the children when they witnessed their mother and grandmother being arrested and whisked away to jail. Instead of unwrapping gifts on Christmas morning, the children were forcibly and needlessly snatched from their mother and grandmother's care and flown back to Colorado with strangers—an unthinkable trauma that will sit with the children for the rest of their lives.

6. Defendants chose to put both children on a plane with complete strangers and several states away from their mother and grandmothers even though the younger child, O.A., just one year old, had an active and worsening case of respiratory syncytial virus ("RSV"), an illness which could have become catastrophic as a result of extended air travel which Defendants insist she undertake.

7. Plaintiffs bring this action to address these egregious violations of their rights.

## PARTIES, JURISDICTION, AND VENUE

8. Until December 20, 2023 Plaintiff Martha Swain ("Martha") and Plaintiff Sue Swain ("Sue") resided in the State of Colorado.

9. Beginning on December 20, 2023, and until the present day, Plaintiffs reside in the State of Washington.

10. Martha is the mother of two minor children, Plaintiffs O.A. and K.K.

11. Sue is the maternal grandmother of O.A. and K.K. and is also Martha's mother.

12. Upon information and belief, at all times relevant to this action, Defendant Routt County Department of Human Services ("RCDHS") is a county governmental agency whose mission is "[t]o **strengthen families** and individuals, and to promote safety and self-sufficiency[]" and which is located at 135 6th Street, Steamboat Springs, CO 80487 (emphasis added).

13. Upon information and belief, at all times relevant to this action, Defendant Camilla Haight ("Haight"), was and is a Social Caseworker and Child Welfare and Adult Protection Supervisor for RCDHS, which is located at 135 6th Street, Steamboat Springs, CO 80487.

14.     Upon information and belief, at all times relevant to this action, Defendant Paunita Muset ("Muset"), was and is a Social Caseworker for RCDHS, which is located at 135 6th Street, Steamboat Springs, CO 80487.

15.     Upon information and belief, at all times relevant to this action, Defendant Kristin Hintz ("Hintz") is a Social Caseworker for RCDHS, which is located at 135 6th Street, Steamboat Springs, CO 80487.

16.     Upon information and belief, at all times relevant to this action, Defendant Steamboat Springs Police Department ("SSPD") is a law enforcement agency located at 2027 Shield Drive, Steamboat Springs, CO 80487.

17.     Upon information and belief, at all times relevant to this action, Defendant Greg Griffin was and is a Sergeant for SSPD, which is located at 2027 Shield Drive, Steamboat Springs, CO 80487.

18.     The Court has subject matter jurisdiction over this account pursuant to 28 U.S.C. § 1331, as this is a civil action arising under the Constitution and laws of the United States.

19.     Venue for this action is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391(b), as Defendants all reside in this judicial district.

## GENERAL ALLEGATIONS

**I.      Routt County Closes Its Case Against the Swains**

20.     On August 17, 2023, after nearly a year of being harassed by RCDHS, the Routt County District Court entered an Order Adopting Allocation of Parental Responsibilities and Closing Case ("APR"), granting full custody of the children and decision-making authority regarding O.A. and K.K. to Sue.

21.     Martha was allowed unlimited parenting time in Sue's presence.

22.     Amongst the provisions of the APR for O.A., which contains identical provisions to the one for K.K., the following are relevant here:

- "Legal Residence of the Child. The Child's legal residence shall be the **residence of Grandmother Sue Swain**. Grandmother Sue Swain shall be the primary caregiver of the Child. **It is understood that Grandmother Sue Swain intends to move from Steamboat Springs, Colorado to Seattle Washington**."

- "**Mother shall be entitled to exercise supervised parenting time of the Child** so long as Mother's visit is supervised at all times by Grandmother Sue Swain or a supervisor agreed to by Sue and Mother. **It is understood that Mother intends to move with Grandmother Sue Swain from Steamboat Springs, Colorado to Seattle, Washington**."

- "The Routt County Court's jurisdiction in this matter . . . shall terminate automatically upon the filing of a certified copy of this order in the Routt [County] District Court[.]"

- "This JV case shall be closed."

(Emphases added.)

23.     The APR vested full custody and decision-making regarding K.K. and O.A. authority with Sue.

24.     The APR placed no parenting or visitation restrictions on Martha so long as Sue was also present.

25.     The APR contained no "continuing jurisdiction" clauses or provisions which would have allowed a Colorado district court or governmental agency to continue maintaining jurisdiction over Martha, Sue, and the children once they left the State of Colorado as they had repeatedly indicated they were planning to do in the APR.

26.     At the time the APR was entered, neither Defendant RCDHS nor any other governmental agency had ever had any legal custody or decision-making authority regarding K.K. and O.A.; all custody and decision-making authority had always rested with Sue or Martha.

27.     The Routt County Combined Court Clerk of Court signed and stamped the APR on August 18, 2023, automatically terminating RCDHS's involvement in and Routt County District Court's jurisdiction over Martha, Sue, and the children.

28.     Plaintiffs were in no way required to give any notice to RCDHS or any other governmental agency prior to relocating to Washington, as the APR repeatedly explicitly stated they would do.

**II.     O.A.'s Biological Father Terrorizes the Swains**

29.     On December 1, 2023, B.A., O.A.'s biological father, broke into the Swains' personal residence, destroyed property, and attempted to commit and/or committed burglary.

30.     Martha and Sue both filed police reports.

31.     Several days later, B.A. and his romantic partner again showed up at the Swains' personal residence and observed Martha, Sue, K.K., and O.A. from the other side of the residence's glass doors.

32.     B.A. and his romantic partner may have arrived in order to make a monetary payment to the Swains, ostensibly to pay for the physical damage B.A. had done, in exchange

6

for them not pressing criminal charges. When B.A. and his romantic partner realized that the Swains were at home, they fled, and Sue filed a second police report regarding this conduct.

33.     B.A. became irate that Sue and Martha filed a police report and explicitly threatened them that "if [they] don't drop the case, [he was] going to report [Martha and Sue] and make sure the kids went into foster care."

34.     Sometime between that threat and December 20, 2023, B.A., in fact, made false reports to RCDHS.

35.     On December 20, 2023, Defendant Hintz and an unknown SSPD police officer showed up at the Swains' personal residence and advised Sue that allegations had been made against Martha.

36.     Sue immediately reported that all allegations were false and were made in retaliation by B.A. as a result of the Swains filing multiple police reports.

### III.     Defendant RCDHS Fails to Address an Array of Ethical Violations

37.     The Swains' fear of continued harassment by Defendants was bolstered by B.A.'s admission to Sue that B.A., O.A.'s biological father, was bribing Deborah Tramitz, who supervised B.A.'s visits with O.A.

38.     Upon information and belief, B.A.'s bribes to Ms. Tramitz were paid in order to gain access to supervised visits with O.A. and/or more favorable reports regarding his parenting time; these reports were drafted by Ms. Tramitz and sent to RCDHS and the court.

39.     Sue, by way of another daughter of hers, reported the alleged bribery to Defendant Hintz.

40.     Defendant Hintz never took any action regarding or undertook any investigation of Sue's report that B.A. admitted to Sue that he bribed Ms. Tramitz.

41.     Defendant RCDHS never took any action regarding or undertook any investigation of Sue's report that B.A. admitted to Sue that he bribed Ms. Tramitz.

42.     Upon information and belief, Defendant Muset made statements and sent text messages to Martha that reflect her personal bias in favor of B.A., denigrating Martha's financial status and living arrangements.

43.     Text messages from RCDHS indicate a willingness and desire to "help [B.A.]" while also going out of its way to harm Martha, such as by contacting her medical care providers to gain negative information on her even though RCDHS knowingly had not obtained the proper HIPAA release.

44.     Defendant Haight has a pattern and practice of exhibiting the same bias against mothers that Defendant Muset did.  Specifically, as a February 24, 2024 Colorado Gazette article[1] reported regarding another case in which Defendant Haight was involved:

> Nor did it matter that the mother of the children in August 2021 reached a settlement with the Colorado Department of Human Services. That settlement required the state agency to overturn November 2019 findings from Routt County's child protective staffer **Camilla Haight, who found the mother had emotionally abused the children and her fiancé had sexually abused one of the children.**

(Emphasis added.)

---

[1] https://gazette.com/colorado-watch/https21-3-million-jury-verdict-calls-into-question-routt-county-custody-case/article_5eb10894-d281-11ee-abc3-e35f024f5bd4.html

45.     Ms. Tramitz has also made statements to Martha and Sue reflecting Defendant Muset's habit and pattern of giving preferential treatment to individual family members during the course of Muset's work with other families.

46.     Defendant RCDHS failed to prevent or take action against Defendant Muset for giving preferential treatment to individual family members during the course of her work, including the preferential treatment given to B.A.

47.     RCDHS must train its employees to treat families with dignity and respect rather than denigrating and belittling the families they are tasked with protecting and keeping safe.

## IV.     The Swains Leave Steamboat Springs for Washington State

48.     Having seen the writing on the wall—that Defendant RCDHS and local law enforcement were not in any way there to protect Martha, Sue, and the children and were instead continuing to harass them after they had been burglarized, nearly assaulted, and threatened—Martha and Sue no longer felt safe in Steamboat Springs and understood that any additional time spent there was a danger to them and the children.

49.     With these fears in mind—and as the APR explicitly and repeatedly allowed them to do—Martha and Sue packed up their belongings, retrieved the children, and left the State of Colorado, fully intending to abandon all actual, intentional, and legal residency in the State of Colorado and instead establish actual, intentional, and legal residency in the State of Washington, where the Swains have extensive family.

50.     By that time, the Swains had, in fact, already sold their Steamboat Springs home of many years and were residing in a rental property.

51.     Martha and Sue, as full legal custodians of both K.K. and O.A., left with the children and were shortly thereafter already outside of Colorado and in Utah.

52.     Despite having no actual or implied jurisdiction over the family by that point—and with the explicit knowledge, as will be explained in further detail below, that they had left Colorado—Defendants RCDHS, Hintz, and Haight were, upon information and belief, upset that the Swains had lawfully left the state to avoid more governmental harassment and in order to simply feel safe from B.A.

53.     Defendants RCDHS, Hintz, and Haight began incessantly texting and calling Martha and Sue, attempting to intimidate them to return to Colorado.

54.     Defendant RCDHS, through Defendants Hintz and Haight, threatened Martha and Sue, telling them that they were "not allowed to leave," "had to bring the kids back," "had no right to do this," and were "in trouble."

55.     At the time they made such threats, Defendants Hintz and Haight knew that their threats were false, had no legal or factual basis, that Martha, Sue, and the children were already outside of Colorado and that Martha and Sue and had full custody over the children.

56.     Given the explicit terms of the APR in terms of both their custody of the children and their ability to leave Colorado and establish residency in Washington, the Swains rightfully ignored all of Defendant Hintz and Haight's intimidation tactics.

**V.      The Defendants Illegally Track the Swains' Movement Across State Lines**

57.     A short time later, the Swains and the children had arrived in the Seattle area, where they immediately established actual, intentional, and legal residency in the State of Washington.

58. Unbeknownst to the Swains, on December 20, 2023, at 5:03 p.m.—at which point the Swains had already abandoned residency in the State of Colorado and were in the State of Utah, on their way to establishing residency in the State of Washington—Defendant RCDHS filed a Verified Emergency Ex Parte Motion for Order of Protection.

59. This December 20, 2023 Motion was never served on Martha or Sue.

60. The Motion was not granted until December 20, 2023, at 7:52 p.m., at which point, again, the Swains had already abandoned residency in the State of Colorado and were not even physically present in Colorado.

61. Even in that December 20, 2023 Order, however, Sue was still permitted to maintain "temporary sole legal and physical custody[.]"

62. The Motion and Order purported to prohibit—without any statutory, factual, or legal basis—to restrict the Swains from "removing the Children from Routt County, Colorado."

63. With limited exceptions, none of which were present here, Defendants knew, at the time they sought this relief, that "citizens have a right to travel throughout the United States 'uninhibited by statutes, rules, or regulations which <u>unreasonably</u> burden or restrict movement.'" *Abdi v. Wray*, 942 F.3d 1019, 1029 (10th Cir. 2019) (quoting *Saenz v. Roe*, 526 U.S. 489, 499 (1999)) (emphasis in original).

64. "Travel," as discussed in *Saenz* and other U.S. Supreme Court cases, "is firmly embedded in our jurisprudence. Indeed . . . the right is so important that it is assertable against private interference as well as governmental action . . . a virtually unconditional personal right, guaranteed by the Constitution to us all." 526 U.S. at 498 (quoting *United States v. Guest*, 383

U.S. 745, 757 (1966)) (also quoting *Shapiro v. Thompson*, 394 U.S. 618, 642 (1969) (Stewart, J., concurring)).

65.     The only examples cited in *Abdi* regarding when the government may restrict interstate travel include (1) *after* a criminal *conviction*; (2) gasoline taxes; (3) toll roads; (4) airport security; and (5) burdens on a single mode of transportation.  942 F.3d at 1029 (internal citations and quotations omitted).

66.     Again, none of the five exceptions listed in *Abdi* were present when Defendants sought to restrict Plaintiffs' ability to travel to Washington.

67.     At the time Defendants sought this restriction on interstate travel, there was not even a criminal investigation, criminal charges, criminal bond, or conviction obtained or ongoing against any Plaintiff.

68.     There is no federal or Colorado state statute permitting a county-level department of human services such as Defendant RCDHS from seeking a restriction on a family's movement.

69.     Even if such statutory or other legal authority existed, which it did not, any purported ability for Defendant RCDHS and the district court to prevent the Swains from leaving Routt County was, by that time, null and void, as the APR explicitly permitted the Swains to leave Colorado without having to provide any notice to RCDHS or any other governmental authority and the Swains had already, in fact, left Routt County and the State of Colorado.

70.     On December 21, 2023, at 12:11 p.m.—at which point the Swains were already in Utah, had abandoned residency in the State of Colorado, and established residency in the State

of Washington—Defendant RCDHS filed a Verified Emergency Ex Parte Motion for Temporary Protective Custody.

71.     The Motion was never served on Martha or Sue.

72.     Despite having already abandoned residency in the State of Colorado, this Motion was not granted until December 22, 2023 at 11:34 a.m.

73.     The December 22, 2023 Order was, similarly, never served on Martha or Sue.

74.     The Order purported to place temporary custody with "RCDHS for out-of-home placement in a kin-like or foster home placement" but, again, such Order was null and void as the APR explicitly permitted the Swains to leave Colorado without having to provide any notice to RCDHS or any other governmental authority and the Swains had already, in fact, left Routt County and the State of Colorado—facts of which Defendants were, at the time the Motion was filed, actually aware.

75.     On or about December 22, 2023, Defendants RCDHS, Hintz, Haight, Griffin, and SSPD began tracking the Swains' cell phone location despite never requesting a duly-signed warrant (as discussed in further detail below).

76.     At that time of this search, all Defendants were or should have been aware of *United States v. Jones*, 565 U.S. 400 (2012), which held that, under the Fourth Amendment, any "monitoring of a person's movements on public streets" through the use of global positioning systems ("GPS") constitutes a "search" under the constitution and, therefore, requires a warrant.

77.     At the time of the warrantless search, Defendants also were or should have been aware of *Riley v. California*, 573 U.S. 373 (2014), which, as discussed in *United States v.*

*Russian*, 848 F.3d 1239 (10th Cir. 2017), held that "a warrant is generally required to search digital information on a cell phone, even when the phone is seized incident to a lawful arrest."

78.     At the time of the warrantless search, Defendants also were or should have been aware of *United States v. Portillo-Camargo*, No. 22-1244, at \*3 n.1 (10th Cir. Oct. 7, 2022), a Tenth Circuit case issued more than a year prior to the warrantless search, which held that

> [a] GPS ping warrant orders a cellular telephone company to affirmatively create evidence about the whereabouts of a particular cellular telephone at the direction of law enforcement by sending a ping to the device and transmitting the [resulting] GPS coordinates . . . to officers.

(Internal citation and quotation omitted.)

79.     In other words, the Tenth Circuit's use of the phrase "GPS ping warrant" in *Portillo-Camargo* did or should have alerted Defendants of the necessity of obtaining a warrant prior to "pinging" Sue's cell phone.

80.     Also in 2022, the United States District Court for the District of Colorado discussed a "GPS data location search warrant" in *United States v. Curiel-Rodridguez*, Crim. 22-CR-013-WJM (D. Colo. Aug. 18, 2022).

81.     Again, the District of Colorado's use of the phrase "GPS data location search warrant" in *Curiel-Rodriguez* did or should have alerted Defendants of the necessity of obtaining a warrant prior to "pinging" Sue's cell phone.

82.     In all, as the result of extensive U.S. Supreme Court, Tenth Circuit, and District of Colorado case law on this precise issue, Defendants were or should have been aware that "pinging" or obtaining any GPS data from a cell phone constituted a "search" and that such a search required a warrant.

83.     Defendants failed to even request such a warrant.

84.     Defendants never obtained a warrant to ping or search Sue's cell phone.

85.     At no point in time did Defendants RCDHS and SSPD actually request that a judicial officer sign the warrant.

86.     Defendants RCDHS and SSPD failed to do so despite RCDHS filing at least *three* other state district court pleadings seeking emergency relief.

87.     There were no exigent circumstances, including those listed in *Storey v. Taylor*, 696 F.3d 987 (10th. Cir. 2012) justifying the warrantless search.

88.     There was no allegation that Martha or Sue had committed a serious or violent crime.

89.     There was absolutely no suspicion that either Martha or Sue was armed.

90.     There was no showing of probable cause to believe that either Martha or Sue had committed any crime; the only crime they were eventually arrested for—custodial interference—was known by all Defendants to be inapplicable given the terms of the APR.

91.     There was no likelihood of Martha or Sue escaping or making their whereabouts unknown as they had repeatedly indicated their intention to establish residency in the State of Washington, which is where they were ultimately located.

92.     There was no reason to enter the premises where Martha and Sue were eventually arrested as they were arrested in public, while eating dinner with the children, and had made a two-week reservation under their own names at the hotel where they were arrested.

93.     Defendants RCDHS, Hintz, Haight, Griffin, and SSPD knew how to request an immediate warrant to "ping" Sue's cell phone but intentionally failed to do so as the request would have revealed that they had no jurisdiction to make such a request.

94.     Instead, after tracking the Swains' location without a warrant, Defendants RCDHS, SSPD, Hintz, Haight, and Griffin began communicating with Washington State's Department of Children, Youth and Families and Washington law enforcement in order to falsely procure the arrest and imprisonment of Martha and Sue, remove their children, and traffic the children across state lines and back to Colorado in order to place them in non-kin foster care.

95.     Sue and Martha's Washington criminal files contain no written communications from any Defendant.

96.     Upon information and belief, and according to the documents Plaintiffs have thus far been able to obtain, Defendants ensured that, outside of sending Court pleadings, the representations they were making to Washington administrative and law enforcement agencies was solely oral so that there would not be a written record of what they specifically stated to such administrative and law enforcement agencies.

**VI.     Defendants Cause the Swains' Wrongful Arrest in Washington State**

97.     On January 3, 2024, after procuring Martha and Sue's arrests and imprisonment and trafficking the children across state lines, both of which will be described in further detail below, Defendant RCDHS admitted how it had located Martha, Sue, K.K., and O.A., as noted in a Petition in Dependency and Neglect RCDHS filed:

> Law enforcement then drafted arrest warrants for Ms. Sue and Martha Swain, which [District Attorney Matt] Karzen signed. **Law enforcement also began a non-warrant track of the Swains' cell phone 'pings'** (records of which cell phone towers their phones were accessing; the pings indicate proximity to those towers and thereby their phones' location). For the next 24 hours, the pings indicated that the Swains—or at least their phones—traveled from Salt Lake City, Utah, through Idaho and Oregon, and Settled in Washington.

(Emphasis added.)

98.     The fact that Defendants procured Plaintiffs' arrest and the subsequent trafficking of the children across state lines as the result of a warrantless cell phone ping is confirmed in a December 24, 2023 Bainbridge Island (State of Washington) Police Department Report in which Officer David Pepicelli wrote:

> Sergeant Greg Griffin, of the Steamboat Springs Police Department (SSPD), was in charge of the case locally in Colorado **and had set up an emergency 24-hour "ping" of Sue's cell phone location**, which showed that her approximate location was on Wing Point Way on Bridge Island . . . The children were entered into NCIC as missing/endangered on 12/22/23, and SSPD "pinged" the location of Sue's cell phone **over a period of 48 hours** beginning on 12/22/23 at 1437 hours.  The location appeared to move north to Salt Lake City airport, before moving northwest into Cle Elum Washington.

(Emphases added.)

99.     Defendants procured Plaintiffs' arrest and the subsequent trafficking of the children by intentionally failing to disclose all relevant documents to Bainbridge Island Police Department ("BIPD"). As the BIPD report itself notes, Defendants selectively conveyed only certain relevant documents to BIPD while simultaneously intentionally failing to disclose others:

> Sergeant Griffin sent me a copy of the temporary custody order, along with an emergency ex-parte motion for order of protection, and motion for temporary protective custody.

100.     Specifically, Defendants intentionally failed to send BIPD the APRs which repeatedly and explicitly authorized Plaintiffs to leave the State of Colorado with the children and establish residency in the State of Washington.

101.     This intentional nondisclosure (and the limited information at its disposal) led BIPD to include that "**[b]ased on the information Sergeant Griffin and DHS provided**, it **appeared** that Sue and Martha had fled the state of Colorado and were actively attempting to conceal the children. Neither Sue nor Martha made any attempt to attend the hearings or be

served the paperwork, despite numerous attempts from both Routt County DHS and SSPD."
(Emphases added.)

102.     In other words, BIPD arrested Sue and Martha solely based upon the false or misleading representations that Defendants had made to them, as BIPD's own police report expressly represents that the arrests were only made based upon Defendants' statements or documents they had sent to BIPD as opposed to an independent investigation which BIPD or any other Washington law enforcement agency undertook.  .

103.     Defendants intentionally failed to disclose to BIPD, when using BIPD to procure Sue and Martha's arrest, that:

• At the time of the arrest, Sue had full, sole custody of the children and that any Orders purporting to state otherwise were null and void and were entered without personal or subject matter jurisdiction over Martha, Sue, or the children;

• Both Sue and Martha had informed Defendant RCDHS and the Routt County District Court of their intentions to establish residency in the State of Washington and the Routt County District Court's explicit recognition of and authorization for them to do so;

• According to the BIPD arresting officer, the only reason for the arrest was "confusion" about who had legal custody of the children, based on information which Defendants had solely provided, which would "have to be sorted out" during Sue's arrest;

• Accordingly, there was no evidence to support the crime for which BIPD eventually arrested Sue and Martha, RCW 9A.40.060 Custodial Interference, 1st

Degree, or, at a minimum, that there was no jurisdictional basis for the Orders upon which the "crime" was based, or, at a minimum, that Sue and Martha's location to procure their arrest in the first place was premised solely on a warrantless cell phone ping search.

104.    In Washington, custodial interference, the crime for which both Martha and Sue were arrested, is defined, in its entirety, as:

(1) A relative of a child under the age of eighteen or of an incompetent person is guilty of custodial interference in the first degree if, with the intent to deny access to the child or incompetent person by a parent, guardian, institution, agency, or other person having a lawful right to physical custody of such person, the relative takes, entices, retains, detains, or conceals the child or incompetent person from a parent, guardian, institution, agency, or other person having a lawful right to physical custody of such person and:
(a) Intends to hold the child or incompetent person permanently or for a protracted period; or
(b) Exposes the child or incompetent person to a substantial risk of illness or physical injury; or
(c) Causes the child or incompetent person to be removed from the state of usual residence; or
(d) Retains, detains, or conceals the child or incompetent person in another state after expiration of any authorized visitation period with intent to intimidate or harass a parent, guardian, institution, agency, or other person having lawful right to physical custody or to prevent a parent, guardian, institution, agency, or other person with lawful right to physical custody from regaining custody.
(2) A parent of a child is guilty of custodial interference in the first degree if the parent takes, entices, retains, detains, or conceals the child, with the intent to deny access, from the other parent having the lawful right to time with the child pursuant to a court order making residential provisions for the child, and:
(a) Intends to hold the child permanently or for a protracted period; or
(b) Exposes the child to a substantial risk of illness or physical injury; or
(c) Causes the child to be removed from the state of usual residence.
(3) A parent or other person acting under the directions of the parent is guilty of custodial interference in the first degree if the parent or other person intentionally takes, entices, retains, or conceals a child, under the age of eighteen years and for whom no lawful custody order or order making residential provisions for the child has been entered by a court of competent

jurisdiction, from the other parent with intent to deprive the other parent from access to the child permanently or for a protracted period.
(4) Custodial interference in the first degree is a class C felony.

105. Defendants knew that the crime of custodial interference could not possibly used as a basis for BIPD to lawfully arrest and imprison Martha and Sue because they:

- did not deny access to the children to any other person or entity with a "lawful right to physical custody" of the children because Sue, in fact, had full and lawful custody and decision-making authority regarding the children;

- did not wrongfully "intend to hold" the children "permanently or for a protracted period" because Sue, again, had full and lawful custody and decision-making authority regarding the children;

- did not take any action to establish that the children were being exposed to a substantial risk of illness or physical injury;

- did not cause the children "to be removed from the state of usual residence" as they had both repeatedly and expressly made their intentions to establish residency in the State of Washington known to the Routt County District Court and RCDHS and had received permission to do so; and

- did not retain the children "after expiration of any authorized visitation period" as, again, Sue had full, unfettered custody of the children and Martha had unlimited parenting and visitation rights so long as Sue was present, which she always was.

106. Nevertheless, Defendants intentionally failed to disclose critical information and documents to BIPD, misrepresented critical facts to BIPD, knowingly failed to effectuate

personal service of the Motions and Orders purporting to remove custody of the children despite knowing the exact location of both Martha and Sue which could have been utilized to effectuate personal service, and obtained such Orders knowing that they lacked personal and subject matter jurisdiction over Martha and Sue when they obtained the Orders.

107. As a result of the above, Defendants manipulated BIPD into falsely arresting Martha and Sue and taking custody of the children.

108. Despite doing so, Defendants' attorney later told B.A. in an email that Defendants, incredulously, had nothing to do with Plaintiffs' arrests:

[B.A.] –

It is my understanding that interference with the custody of children can constitute a crime. Once Washington determined the Swains committed that crime, law enforcement there pursued and arrested them. Us, the Department, had no say in that choice or action. Once they were arrested and since the Department of Human Services have custody of the Children, plans were made to return them to the Department's care.

Sincerely,

Matthew Fredrickson
Assistant County Attorney
Routt County Attorney's Office

109. BIPD arrested Martha and Sue on Christmas Eve, December 24, 2023.

110. Even at the time of their arrest, Martha and Sue were not served with any summonses or paperwork identifying the alleged bases for their arrests and charges of custodial interference.

111. Sue spent Christmas in jail and was unable to bond out until December 27, 2023.

112.    Martha spent Christmas and New Year's in jail and did not bond out until January 5, 2023.

## VII.    K.K. and O.A. are Cruelly and Needlessly Torn from Their Family

113.    As a result of Martha and Sue's arrests, K.K. and O.A. were placed in foster care in Washington; the foster parents, fortunately, were at least relatives of Martha and Sue and therefore related to them as well.

114.    Despite being able to live with certified foster parents in Washington who also happened to be their relatives, K.K. and O.A. were subsequently—and cruelly—flown by Defendant RCDHS, by way of two of its individual Defendants, back to Steamboat Springs on or about December 27, 2023.

115.    O.A. had RSV at the time of her removal and flight and Defendant RCDHS still insisted on flying with her back to Colorado before seeking appropriate medical care.

116.    Flying with RSV can significantly worsen a baby such as O.A.'s RSV and expose the baby to catastrophic health consequences, all of which Defendants ignored.

117.    Upon arriving in Colorado, K.K. and O.A. were placed with non-kin foster caretakers.

118.    K.K. and O.A. have suffered and/or continues to suffer mental, emotional, and psychological injuries as a result of Defendants' conduct. Both children displayed changed behaviors after the events, including increased separation anxiety, difficulty sleeping, and becoming more withdrawn.

119.     Both children tragically believe that Sue and Martha have abandoned them when, in reality, it is unconstitutional governmental actions that have separated O.A. and K.K. from Sue and Martha.

## VIII.   Kitsap County Releases the Swains After their Wrongful Arrest

120.     Realizing the obvious lack of jurisdiction and factual bases for their arrests and criminal charges, charges against Martha and Sue pending in Kitsap County Superior Court were quickly dismissed on January 5, 2024, just shortly after their arrest.

121.     However, despite this criminal vindication, Defendants had already inflicted catastrophic damage upon Martha and Sue, including:

- Falsely and maliciously procuring their arrests;

- Tracking their location, which directly led to their false arrest and imprisonment, through the use of an unwarranted cell phone GPS "ping" search when no exigent circumstances existed to do so and Defendants knew how to— as evidenced by their other pleadings—obtain emergency relief but intentionally failed to do so;

- Manipulating law enforcement from another jurisdiction into arresting and jailing them;

- Falsely and maliciously procuring their imprisonment;

- Upon information and belief, falsely and maliciously procuring the arrest and imprisonment of Martha and Sue in order to obtain custody of the children and traffic them across state lines, from Washington to Colorado and place the

children in non-kin foster care, which had been Defendants' intended result for well over a year; and

- Depriving Martha and Sue of numerous fundamental, constitutional civil rights including, but not limited to, those of due process, familial integrity, freedom from unlawful search and seizure, interstate travel, and freedom from false arrest and imprisonment.

122. Despite the State of Washington clearly recognizing the falsity of the cases against Sue and Martha by quickly dismissing the criminal charges, Defendants have, to this day, failed to correct their mistakes.

123. Defendants continue to deprive Plaintiffs of their civil rights, most importantly, the fundamental right to familial integrity.

124. At the time of filing, and as a direct result of Defendants' past and continued civil rights actions, the children are still wrongly being held with non-kin foster parents.

## FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 - Deprivation of Procedural Due Process
### (All Defendants)

125. Plaintiffs incorporate herein by reference all of the allegations contained in the preceding and foregoing paragraphs of this pleading.

126. The Fourteenth Amendment to the United States Constitution prohibits state actors such as Defendants from depriving an individual of liberty without due process of law.

127. Included within this protection are the rights to a full, fair, and adequate investigation when state actors deprive or attempt to deprive an individual of fundamental liberty interests, including their right to raise, be part of, and maintain a family.

24

128.     Plaintiffs have fundamental liberty interests in raising, being a part of, and maintaining a family.

129.     Defendants violated Plaintiffs' federal due process rights when they undertook numerous actions which include but are not limited to:

- Obtaining Martha and Sue's location—and subsequent arrest and imprisonment—using an unwarranted cell phone ping and GPS search;

- Filing numerous Motions and obtaining numerous Orders purporting to remove the children from Sue's custody and place custody of the children with the state without ever personally serving Martha or Sue with same and despite—as a direct result of the unwarranted searches—knowing their physical locations and therefore having the ability to personally serve them;

- Intentionally failing to give notice of any critical hearings to Martha or Sue in which custody was subsequently vested with RCDHS;

- Unconstitutionally and unlawfully restricting their fundamental right to interstate travel;

- Intentionally failing to disclose highly material evidence, information, and documents to BIPD and intentionally providing only some evidence, information, and documents to BIPD in order to manipulate BIPD into arresting and imprisoning Martha and Sue and for the Kitsap County District Attorney's Office to prosecute them;

- Failing to personally serve Martha and Sue with a petition in dependency and neglect which may permanently deprive Martha and Sue of their familial integrity and right to care for and parent K.K. and O.A.; and

- Failing to correct the above civil rights violations even though the Kitsap County District Attorney's Office and the Kitsap County Superior Court quickly realized that there was no basis for the charges against Martha and Sue and dismissed them less than two weeks after their arrest.

130. Plaintiffs have been damaged by Defendants' procedural due process violations.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 - Deprivation of Substantive Due Process
### (All Defendants)

131. Plaintiffs incorporate herein by reference all of the allegations contained in the preceding and foregoing paragraphs of this pleading.

132. The Fourteenth Amendment to the United States Constitution protects fundamental liberty interests against certain governmental intrusions irrespective of the fairness of the procedures utilized. This substantive guarantee is intended to prevent state actors from employing their power in an abusive or oppressive manner.

133. Defendants conduct violates substantive due process by severely interfering with Sue and Martha's fundamental right to due process including their right to be free from infringements such as unlawful arrest, imprisonment, restrictions on interstate travel, and lack of familial integrity as a result of unfair proceedings which lack due process.

134.    But for Defendants' conduct, Sue and Martha would not have experienced unlawful arrest, imprisonment, restrictions on interstate travel, and the loss of their familial integrity, amongst other civil rights violations.

135.    Plaintiffs have experienced numerous civil rights and constitutional rights violations and other damages including, but not limited to, false arrest and imprisonment and loss of familial integrity, as a result of Defendants' substantive due process violations.

136.    Defendants' actions in procuring their arrest and imprisonment based upon false or, at a minimum, intentionally withholding critical evidence, forcing the children into foster care, first in kinship foster care and now in non-kin foster care, tracing Plaintiffs' locations using cell phone "pings" without having first obtained a warrant for these searches, trafficking the children across state lines, and, to this day, refusing to correct their grievous mistakes which another jurisdiction (Kitsap County, Washington) immediately concluded to be without merit, shock the conscience.

137.    Plaintiffs have been damaged by Defendants' substantive due process violations.

## THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – False Arrest & False Imprisonment
### (All Defendants)

138.    Plaintiffs incorporate herein by reference all of the allegations contained in the preceding and foregoing paragraphs of this pleading.

139.    Defendants caused BIPD to wrongfully and illegally arrest Martha and Sue and falsely charged Martha and Sue with Custodial Interference.

140.    The wrongful, unjustifiable, and unlawful apprehension, arrest, and detention of Martha and Sue was carried out without any basis, without Martha or Sue's consent, and without probable cause or reasonable suspicion.

141.    Defendants knew they lacked probable cause to cause the  arrest of/unreasonably seize Martha and Sue because they knew that Martha and Sue had not engaged in any unlawful conduct.

142.    No reasonable officer would have believed there was probable cause to cause the arrest of/unreasonably seize Martha and Sue under these circumstances.

143.    Throughout this period, Martha and Sue were unlawfully, wrongfully, and unjustifiably held under arrest, deprived of their liberty, and falsely charged. At all times, the unlawful, wrong, and false arrest/unreasonable seizure of Martha and Sue was without basis and without probable cause or reasonable suspicion.

144.    Defendants deliberately undertook these actions and their misconduct occurred without any fault or provocation on the part of Martha and Sue.

145.    Defendants acted under pretense and color of state law. Defendants acted in abuse of their powers and beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally to deprive Martha and Sue of their constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.

146.    Defendants' conduct was willful, wanton, and reckless.

147.    As a direct and proximate result of Defendants' misconduct and abuse of authority detailed above, Martha and Sue sustained the damages hereinbefore alleged.

148.    Plaintiffs incorporate herein by reference all of the allegations contained in the preceding and foregoing paragraphs of this pleading.

149.    Defendants maliciously and without justification caused the commencement of criminal proceedings against Martha and Sue.

150.    Defendants caused Martha and Sue to be charged with crimes falsely, maliciously, in bad faith, and without probable cause.

151.    Defendants knew they lacked probable cause to cause the prosecution of Martha and Sue because they knew that Martha and Sue had done nothing wrong and should not have been arrested, and that no reliable information suggested Martha and Sue had committed any offense.

152.    No reasonable officer would have believed there was probable cause to cause the prosecution of Martha and Sue under these circumstances.

153.    After Martha and Sue spent multiple nights in Kitsap County Jail apart from the children, K.K. and O.A., and defended themselves in criminal proceedings, all charges against them were terminated in their favor.

154.    Defendants acted under pretense and color of state law. Defendants acted in abuse of their powers and beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Martha and Sue of their constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.

155.    Defendants' conduct was willful, wanton, and reckless.

156.    As a direct and proximate result of Defendants' misconduct and abuse of authority detailed above, Martha and Sue sustained the damages hereinbefore alleged.

## FIFTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress
### (Defendants Hintz, Haight, and Muset)

157.    Plaintiffs incorporate herein by reference all of the allegations contained in the preceding and foregoing paragraphs of this pleading.

158.    As set forth above, the Individual Defendants' actions were extreme and outrageous.

159.    The Individual Defendants' actions were undertaken with the intent to cause Plaintiffs' severe emotional distress and/or were done in disregard of a substantial probability of causing severe emotional distress.

160.    As a result of the Individual Defendants' actions, Plaintiffs suffered extreme and severe emotional distress.

161.    As a result of the malicious and intentional infliction of emotional distress by the Individual Defendants, Plaintiffs suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray (1) for judgment in favor of Plaintiffs and against Defendants, in an amount to be determined by the trier of fact for their losses as set forth above and for costs, expert witness fees, attorney's fees, filing fees, and pre- and post-judgment interest; and (2) such other further relief as the Court may deem appropriate, just, and proper.

Respectfully submitted on this 11th day of March, 2024.

/s/ Elliot A. Singer
Elliot A. Singer (#47490)
CONDUIT LAW, LLC
2590 Welton St.
Suite 200
Denver, CO 80205
Phone: (720) 432-7032
Facsimile: (720) 310-2224
Email: elliot@conduit.law
*Counsel for Plaintiffs*

Plaintiffs' Address:
P.O. Box 11642
Bainbridge Island, WA 98110